IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> WISAM NAGIB KHERFAN-OKDE, et al, <br><br> Defendants. | 1:25-CR-51 <br><br> Hon. Michael S. Nachmanoff |

## ANTOINE KASSIS'S POSITION ON SENTENCING

Antoine Kassis will come before the Court to be sentenced after a jury found him guilty of violating two United States statues by agreeing to participate in a scheme in which he would trade money or weapons to DEA agents posing as representatives of the Colombian National Liberation Army, or "ELN," in exchange for 500 kilos of cocaine he was to then participate in distributing in the Middle East.

Through undersigned counsel, he respectfully requests that the Court impose twenty years of incarceration, the mandatory minimum, as punishment for the conviction for conspiring to violate 21 U.S.C. § 960a, and ten years as punishment for the conviction for conspiring to violate 18 U.S.C. § 2339B.

Notwithstanding his intent to appeal his conviction, Mr. Kassis understands that sentencing proceeds from the assumption that he is guilty. He asks that, in sentencing him, the Court focus on what the jury necessarily found, rather than on the larger case that the government has attempted to make from the start.

Mr. Kassis is a 60-year-old father of two. His parents were Syrian Maronite Catholics, but they emigrated to Lebanon, where Mr. Kassis and his siblings were all born and raised. Mr. Kassis attended Catholic schools his entire life, also working at his father's side in the family restaurant – his father's second, which he opened after the first was burned down during the Beirut War. Mr. Kassis's formative and adult years have been marked by war after war in Lebanon. He married his wife 20 years ago and they have two children: one is autistic. He moved the family to Canada in 2013 in the hope of obtaining better care for that son, but the family eventually moved back to Lebanon. There, he continued working in the restaurant business until 2018. In 2024, his landlord sued him and attempted to evict him for unpaid rent.

From 2022 to 2024, codefendant Alirio Rafael Quintero-Quintero ("Quintero") laundered money for CSI, a DEA agent posing as someone representing the ELN. He bragged about working with other organizations well-known to engage in large scale violence. Quintero introduced the agent to co-defendant Wisam Nagib Kherfan-Okde ("Kherfan"), allegedly a higher up in Quintero's money laundering organization. When Kherfan learned that CS1 was interested in widening her distribution network in the Middle East and purchasing weapons, he raised the topic of Mr. Kassis.

Kherfan told the agent that Mr. Kassis could provide weapons and cash for large shipments of cocaine, and he and Quintero arranged for Mr. Kassis to meet CS1 and CS5. The jury's verdicts reflect that it concluded from the evidence that Mr. Kassis was guilty of agreeing to participate in the deal the DEA agents and Kherfan set out for him, in which he would be delivered 500 kilos of Colombian cocaine, and,

2

in exchange, he would deliver some combination of weapons and money. The jury's verdicts also reflect that jurors believed that Mr. Kassis understood that CS1 and CS5 represented the ELN, an organization that had engaged in terrorist acts.

The government cannot resist the temptation to cast Mr. Kassis as a major international kingpin "who used his high-level access to the Syrian government under the Assad regime to traffic cocaine and weapons," and as someone who "has been working with Hizballah and the Assads to distribute cocaine since the 1990s."[1] These characterizations certainly make for a headline-grabbing press release. But not only are these aspersions based on thin reeds, but the charges also did not rest on them. Mr. Kassis accordingly did not undertake to defend himself against them at trial, and the jury's verdict also did not affirm them.

For all of those reasons, Mr. Kassis respectfully requests that the Court sentence Mr. Kassis for participating in the plot proven at trial, and not sentence the person the government (wrongly) thinks he may also be.

I.     **Objections to the PSR.**

   A.     *Consistent with his not-guilty plea, Mr. Kassis objects generally to the PSR.*

Because Mr. Kassis maintains his innocence, the defense objects generally to the description of offense conduct and to the calculation of the guidelines in the presentence report ("PSR"). However, without agreeing to or addressing each

---

[1] *See* U.S. Dep't of Justice, "Federal jury convicts dual Lebanese-Syrian national for his role in a narco-terrorism conspiracy," March 23, 2026 Press Release, at https://bit.ly/4gMa65y (last visited 6/23/26); Gov't Sent. Memo., ECF 195 at 8, 11. *See also* PSR ¶ 14.

3

statement in the PSR, the defense does not dispute that the jury's verdict and/or other evidence provides the Court with sufficient to evidence to find by a preponderance of the evidence that some of the guidelines assessed in the PSR do in fact apply. However, that is not the case with respect to some allegations noted in the PSR, and some of the enhancements assessed in the PSR to which he offers the following more particular objections.

    B.    *The defense objects to including unsupported claims that Mr. Kassis used high-level access to the Assad regime, and worked with Hezbollah, in the PSR.*

The defense objects to statements in the PSR that give the impression that Mr. Kassis had and benefited from special access to the Assad regime in Syria, and that he worked with Hezbollah. Specifically, the PSR states that he "used his high-level access to the Syrian government under the Assad regime to facilitate his drug trafficking and engage in the sale of military grade weapons diverted by the Syrian government to the black market."[2] It also says that he "has been working with Hizballah and the Assad family to distribute cocaine since the 1990s."[3] Relatedly, it states that "According to evidence gathered during the investigation, including the defendant's own statements, the defendant used his restaurants and nightclub to further his drug trafficking activities."[4] Mr. Kassis respectfully requests that the Court order these sentences stricken from the PSR.

---

[2] PSR ¶ 14.

[3] *Id.*

[4] PSR ¶ 109.

As for the statement in the PSR that Mr. Kassis himself admitted to using his clubs and restaurants "to distribute drugs and further his criminal activity" in a discussion with CS5, that is unsupported by the evidence. As support for this, the government cites GE 5-6A at 41. *See* ECF 195 at 7. But the conversation the government cites is clearly about *use* of cocaine in nightclubs, including the one he previously ran: Mr. Kassis was explaining that he learned while running his popular nightclub in Lebanon that Moroccans, and Emiratis, and "all the famous in Arabic world" come to Lebanon, where "nightlife . . is very good," and "take coke," which the Lebanese do as well whereas, "in Syria, nobody takes this," or few do. GE 5-6A at 41.

To support the allegations regarding the Assad regime and Hezbollah, and the overall characterization of Mr. Kassis's "connected" stature in the Lebanese / Syrian drug trafficking world throughout the sentencing memo, the government points to a combination of statements by a paid informant, CS6, boasting by Kherfan and Kassis in the midst of trying to convince CS1 and CS5 they were legitimate and could be trusted, and other weak evidence.

The claims about the 1990s come from CS6; he is also offered up to support the argument that Mr. Kassis had a special relationship with the key members in the Assad regime, and Hezbollah. According to government disclosures, he is a convicted criminal who lied his way into Europe using another person's passport In his texts with his handlers, he repeated several times that he was in dire need of money to pay his bills, and that he was hoping for payments from the DEA to help. His history and motivation to lie or exaggerate provide the first reason to disregard his claims.

5

A second is that  much of what he describes, apart from Mr. Kassis sharing cocaine with him and with VIP customers of his nightclub, is what he "surmised," or "heard." *See id.* He provided not a single account of witnessing first-hand a deal between Mr. Kassis and either any member of Hezbollah, or any member of the Assad regime – not in the 1990s, and not ever. *See* ECF 195, Attachment 1. Finally, this witness was not always consistent, and key features of his comments seemed designed to pique his handler's interest since he needed money from them. For example, whereas he reportedly told the lead agent in the Kassis investigation when she interviewed him after Mr. Kassis's arrest in 2025 that he had heard that Mr. Kassis had begun working with "Maher" al Assad years ago, as the government notes (ECF 195 Attachment 1), that is not what he told his own handlers in 2024. In  2024 texts and debriefs with his own DEA handler, he had described Mr. Kassis as someone who worked with "Samer" al Assad. Both al Assads are notorious, and would not have been easily confused, particularly by someone as in the know as CS6 claimed to be. Mention of either would have been sure to pique the interest of DEA agents from whom he was seeking payment, and it seems that was CS6's primary goal. On the other hand, had he actually known of a connection between Mr. Kassis and Maher al Assad, it would have made no sense to omit mention of that in the several times he offered up a supposed connection to Samer in 2024. The logical conclusion is that he picked a notorious al-Assad cousin to mention to his own handlers to bolster what he had to offer about Tony Kassis in 2024, and the claim of a known connection to

6

Maher Kassis arose only later, when speaking with agents in this case after Mr. Kassis's arrest.

The defense acknowledges that Mr. Kassis did state in a recorded meeting with the CSs that he "works with" the brother of Bashar al Assad, Maher al Assad, and that he and Kherfan suggested in other ways that he had special connections with the regime that gave him special access. However, there has been no corroboration of any of their boasts about connections with the notorious Maher al Assad. Moreover, the vast majority of references to the Assad regime during this and other meetings were to the need to *pay* the Fourth Armored Division of the Syrian Army (purportedly controlled by Maher al Assad) for the privilege of unloading cocaine in a Syrian port. *See e.g.*, GE 3-39A at 1 (Kherfan explaining the tax Syrian imposed on imports); 3-61A at 38-39 (Kassis explaining same); 3-63A at 4 (Kassis discussing the 10,000 tax); *id.* at 28-30 (Kherfan stating that the regime taxed anyone delivering drugs to Syria). These statements were echoed in the testimony of the government's witness, Caroline Rose, who described the regime, and particularly the Fourth Armored Division and Maher al Assad as engaging in "checkpoint taxation" with regard to drugs arriving in Syria. In other words, the preponderance of the evidence suggests that Mr. Kassis no more "worked with" or had a special relationship with the Assad regime than a

person going over a bridge "works with" the person in the toll booth, or a taxpayer "works with" the tax collector.[5]

To be sure, if Mr. Kassis ever did take part in drug shipments to Syria and accordingly pay that "checkpoint tax," no one forced him to do that in the way a government compels its citizens to pay taxes. But for participants in drug distribution to pay this kind of generally applicable "tax" is a far cry from "working in conjunction with the Assad regime" to distribute drugs, as the government would have it, ECF 195 at 8, or from "using high-level access" to do so, as the PSR puts it.

Likewise, the evidence that Mr. Kassis "used high-level access to" or "worked with" the Assad regime to obtain weapons was also lacking. Indeed, there was no evidence corroborating that Mr. Kassis ever participated in *any* weapons transaction before he told CS1 and CS5 in 2024 that he could deliver the weapons they asked for. Further, notwithstanding Kherfan and Mr. Kassis's claims in September of 2024 that Mr. Kassis could deliver weapons in exchange for drugs, it was not until the Assad regime was rapidly *crumbling*, in the first week of December, that Mr. Kassis managed to send any photos of weapons to the group text chat with the Colombians CS1 and CS5, on December 3, 2024. This suggests that if he did eventually obtain any access to Syrian Army weapons, that flowed not from any special connection to

the regime, but due to the *fall* of that regime, or at least that any access he had  had never been attributable to any special connection with the regime.[6]

As for the allegation that Mr. Kassis "works with Hezbollah," convincing evidence contradicts that notion: During the September meeting in Istanbul that Mr. Kassis did not know was being recorded, and in which he spoke openly about the possibility of illegal conduct (the deal CS1 and CS5 proposed), Mr. Kassis strenuously objected when he thought someone was suggesting that he works with Hezbollah. He said "I don't like Hezbollah" twice; he said "I am against Hezbollah . . . I don't like them," and he implied that Hezbollah stays away from him. *See* GE 3-63 at 35-36.

It is extremely serious to accuse a person of "working with" Hezbollah, or of having, or having used, a special relationship with the Assad regime. Accusations like these could place Mr. Kassis and his entire family in grave danger at home and in many parts of the world. In light of that, and in light of the thin evidence supporting these allegations, the defense asks that the Court order these statements removed from the PSR, and that the Court sentence Mr. Kassis on the basis of the conduct

---

[6] *See, e.g.*, Al Jazeera Staff, "What happened in Syria? How did al-Assad fall?" *Al Jazeera* (Dec. 8, 2024), available at https://bit.ly/43Y6CFE (last visited 6/23/26) ("Soldiers and police officers were reportedly abandoning their posts, handing over their weapons, and fleeing ahead of the opposition advance."); S. Hartley et al., "'Every Gun Was Taken' Syria Could Fuel Arms Trafficking Crisis," *Inkstick Media* (July 1, 2025), at https://bit.ly/4bhGjOy (noting that weapons abandoned in the fall of the Assad regime "flowed into the hands of civilians, criminals, and armed groups" and that "in Lebanon, arms trafficking incidents involving military weapons" including weapons only issued to elite units in Assad's army, "tripled in the four months following the Assad regime's collapse compared to the same period before," and that these incidents included elite units in Assad's Syrian Arab Army). In other words, the fall of the regime led to even elite unit weapons becoming widely available.

that the jury actually found to be proven at trial, and not based on inflammatory conjecture regarding uncharged and unproven conduct.

### C.    *Several enhancements are not supported by sufficient credible evidence.*

The defense raised several objections to the guideline calculation in the PSR. The Court does not need to resolve them, because the guideline range would not change even if the Court were to sustain the defense objections. With that in mind, the defense includes the objections in full below so as to preserve them, and because some of the factual issues raised by these guidelines (particularly those discussed at pages 11-12, 16-18, and 20-22) are relevant to other portions of this memorandum.

#### 1.    § 2D1.16(b)(2) does not apply because Mr. Kassis did not use, threaten, or direct the use of violence as part of relevant conduct.

The defense objects to application of the enhancement in U.S.S.G. § 2D1.1(b)(2) for use of violence, credible threats of violence, or directing the use of violence. The PSR bases this enhancement on the statements in paragraph 74, describing an incident in which Mr. Kassis purportedly directed CS6 to threaten and/or harm "Frank," a person who had "scammed me and my people," and the fact that this discussion took place on calls in which the two were also discussing a plan to distribute drugs held in Papua New Guinea in Australia. However, this cannot be considered "relevant conduct" for the offense of conviction. *See* U.S.S.G. § 1B1.3(a).

The government argues that this direction to CS6 regarding Frank is relevant conduct under § 1B1.3(a)(1) because the evidence is that Mr. Kassis "committed . . . counseled, commanded, induced, procured" the threat "during the commission of the offense of conviction." ECF 195 at 3. But he manifestly did not: the recording of the

10

Frank discussion at issue took place in March of 2024, and Mr. Kassis did not enter either conspiracy he was convicted of committing until April of 2024 at the earliest. *See* ECF 10 (Indictment); ECF 195 at 3 (acknowledging that "the charged conspiracies were beginning" in April of 2024).

In the alternative, the government adopts the Probation Office's assessment that the recording in which Mr. Kassis appears to direct CS6 to commit violence against Frank in March of 2024 is relevant conduct because it was an act that Mr. Kassis undertook as part of the "same course of conduct or common scheme or plan as the offense of conviction," pursuant to U.S.S.G. § 1B1.3(a)(2). ECF 195 at 3-4. The argument boils down to this: Mr. Kassis was convicted of a conspiracy to buy drugs from the ELN to sell in Lebanon; that falls within the universe of "the international distribution of drugs;" other evidence suggests Mr. Kassis was engaged in the ongoing international distribution of drugs; and the discussion about Frank was about the international distribution of drugs and took place near in time to when the charged conspiracies were beginning. *Id.*

The first flaw in this argument is that there is no proof of its premise, that the Frank discussion had to do with the international distribution of drugs. The person on the recording speaking of Frank told CS6 that Frank had "scammed my friends and their money." GE 7-4A at 15-16. Although this discussion took place on a call in which a future drug deal also appeared to be under discussion, the speaker never said that the "scamming" at issue also had to do with drug dealing, let alone the same

11

scheme. *Id.* In short, there was nothing tying this discussion about Frank to "international drug distribution" at all.[7]

Second, the government skips over an element required for application of U.S.S.G. § 1B1.3(a)(2). This guideline is only triggered by acts and omissions that were part of offenses that would be *required* to be grouped under U.S.S.G. § 3D1.2(d). U.S.S.G. § 1B1.3(a)(2) & App. Note 5(A).[8] But even if the Court could conclude that the threat at issue *did* relate to a drug dealing offense, that does not establish that grouping would be required under that guideline.

The Probation Office argues that the unidentified purported drug deal underlying the threat at issue constitutes offense conduct that "is of a character for which § 3D1.2(d) would require grouping" because that guideline states that all § 2D1.1 counts are required to be grouped, and § 2D1.14 refers to back to § 2D1.1 to determine the based offense level.[9]

But there are several sections of Subchapter § 2D1 that, like § 2D1.14, refer back to § 2D1.1 to determine the base offense level; indeed, most do. If it were the case that all offenses covered by guidelines that refer back to § 2D1.1 were required to group, they would all be listed along with § 2D1.1 in the table of mandatory

---

[7] The speaker and CS6 also seem to be discussing drugs

[8] The government seems to suggest that grouping of a count concerning the presumed drug deal underlying the Frank comment would be required under § 3D1.2(b). ECF 195 at 2 (citing application note 4, which concerns that guideline). But that is irrelevant. Only circumstances that would require grouping of resulting counts under 3D1.2(d) trigger application of § 1B1.3(a)(2).

[9] PSR at 28.

12

grouping guidelines in U.S.S.G. § 3D1.2(d). But they are not. Some of the 2D1 guidelines *are* listed along with § 2D1.1 as counts that must always be grouped (§§ 2D1.2, 2D1.5, 2D1.11, 2D1.13); others, including § 2D1.14, are *not* (§§ 2D1.6, 2D1.7, 2D1.8, 2D1.9, 2D1.14). Significantly, both universes include guidelines that, like § 2D1.14, refer back to § 2D1.1 to determine the base offense level. The logical conclusion from all of this is that the fact that an offense is covered by a guideline in 2D1 that refers back to § 2D1.1 to determine the base offense level does not make it "of a character for which § 3D1.2(d) would require grouping of multiple counts." *See* U.S.S.G. § 1B1.3(a)(2).

Probation also points to U.S.S.G. § 1B1.5(c), arguing that because § 2D1.14 refers to § 2D1.1 for purposes of determining the base offense level, then § 3D1.2's mandate that all § 2D1.1 offenses will group applies to § 2D1.14 as well. But this is wrong too.

Guideline section § 1B1.5(b) provides:

> (1) An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions), except as provided in subdivision (2) below.
>
> (2) An instruction to use a particular subsection or table from another offense guideline refers only to the particular subsection or table referenced, and not to the entire offense guideline.

And subsection (c), to which Probation referred, provides:

> If the offense level is determined by a reference to another guideline under subsection (a) or (b)(1) above, the adjustments in Chapter Three (Adjustments) also are

> determined in respect to the referenced offense guideline, except as otherwise expressly provided.

Subsection (a) referred to above concerns "cross references," and there is none in § 2D1.14. Thus, subsection (c) could only apply here if "the offense level under" § 2D1.14 were "determined by a reference to another guideline under section . . . (b)(1)." But § 2D1.14 does *not* include "an instruction to use the offense level of another offense guideline," the type of instruction covered by (b)(1). Instead, it explicitly instructs that *portions* of § 2D1.1 shall be incorporated in determining the base offense level; it states:

> (a) Base Offense Level (1) The offense level from §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy) applicable to the underlying offense, except that §2D1.1(a)(5)(A), (a)(5)(B), and (b)(18) shall not apply.
>
> (b) Specific Offense Characteristic (1) If §3A1.4 (Terrorism) does not apply, increase by 6 levels.

To be sure, U.S.S.G. § 2D1.14 incorporates *most* of U.S.S.G. § 2D1.1, but it does not incorporate the entire guideline. Thus U.S.S.G.§ 1B1.5(b)(1) does not apply, and neither does § 1B1.5(c): they do not provide the answer to the question of whether a § 2D1.14 counts would group with each other, or with other drug offenses under § 3D1.2(d), either in the abstract, or as applied here.

Where no more particular guideline provides definitive direction on whether counts would necessarily group under § 3D1.2(d), that guideline provides that "grouping under this subsection may or may not be appropriate," and directs that "a case-by-case determination must be made based upon the facts of the case and the

applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level." Here again, the fact that this entire proposition hinges on the mere assumption that the discussion about "Frank" concerned a drug deal is reason to not apply it.

Without confirmation that this discussion related to a drug deal, and what kind of deal it was, for how much, the parties involved, how it was to be executed, what role Mr. Kassis may have played in it (as opposed to the "friends" that were "scammed"), etc., the Court cannot conduct the necessary "case-by-case determination" of whether a hypothetical count based on this purported drug deal would group with the offense of conviction. *See* U.S.S.G. §§ 3D1.2(d). Accordingly, the Court does not have before it sufficient evidence to determine that the first prerequisite for application of 1B1.3(a)(2) is satisfied.

Likewise, without more, the Court cannot possibly assess whether this purported drug transaction underlying the request regarding Frank was "part of the same course of conduct or common scheme or plan as the offense of conviction," the second prerequisite for application of §1B1.3(a)(2). Indeed, Application Note 5(B) would require the Court to consider whether offenses purported to constitute relevant conduct have "common victims, common accomplices, common purpose, or similar modus operandi," and/or the "degree of similarity of the offenses, the regularity (repetitions) of the offense, and the time interval between the offenses." §1B1.3(a)(2), App. Note. 5(B). The Court has none of that to work with here, only the government's conjecture.

As such, the Court should find that there is not sufficient evidence to conclude that the comments about Frank constitute "relevant conduct," and accordingly find that Mr. Kassis's guidelines are not enhanced 2 levels by § 2D1.1(b)(2) as contemplated by paragraph 82 of the PSR.

2. <u>§ 3B1.1 does not apply because there is not reliable evidence that Mr. Kassis was an organizer or leader of five or more people or otherwise extensive conduct.</u>

The defense objects to application of the adjustment in U.S.S.G. § 3B1.1 for being an "organizer or leader." The PSR appears to largely base this enhancement on statements made by Mr. Kassis and co-defendant Kherfan about Mr. Kassis, such as those reported in paragraph 72 (Mr. Kassis referring to "my group in Latakia Syria ander [sic] name military group 4") and 73 (Mr. Kassis referring to directing "300 people" at the port to unload shipments). However, no corroboration of these claims was discovered in the vast amounts of discovery in this case, and these claims were suspect in the first place, given that they were made in the course of marketing Mr. Kassis as a person capable of delivering on the deal under discussion with CS1 and CS5. As such, there is not a "sufficient indicia of reliability to support [the] probable accuracy of these claims," particularly the claim that he either led or managed more than five participants, as this adjustment requires, and they should accordingly be disregarded. *See* U.S.S.G. § 6A1.3.

Pointing to the flexibility in factors that can support this enhancement, the government claims that Mr. Kassis was "the central organizing force for this offense," ignoring that Kherfan introduced Mr. Kassis to CS1 and CS5, and that both Kherfan

and Quintero excluded Mr. Kassis from some of their discussions with CS1 and CS5, as established at trial. Next, the government mistakes evidence that Mr. Kassis was the *face* of the Lebanese / Syrian side of the proposed deal with proof that he was *in charge* of that side of the deal. For example, the government says that he admitted to agents that "he had the connections" to a weapons trafficker (Housam Cashou) and a drug trafficker (Ali Hikmat Issa, a/k/a Ali Shalish), respectively "who would *facilitate* the deal." ECF 195 at 5 (emphasis added). But the truth is that Mr. Kassis told agents that these individuals were the parties with the power. Cashou possessed the weapons in images Mr. Kassis sent, and Shalish was the one who was to take custody of any drugs the Colombians sent, organize their sale, and provide Mr. Kassis with any eventual cut.[10] These statements are more consistent with his being a go-between and facilitator, as he described himself to the agent, *not* the decisionmaker. Even the chat the government cites between Mr. Kassis and Kherfan is more consistent with that notion: the text states that he would need someone to "*introduce* us" to a source of weapons, ECF 195 at 5, *i.e.*, he did not personally know the source in question. In the end, the only thing the government points to that contradicts the impression that Mr. Kassis was at most a go-between are boasts that are uncorroborated by credible evidence.

---

[10] Notably, the government's expert, Caroline Rose, described Ali Shalish as a well-known Syrian drug trafficker, and indeed he is notorious. But in all of the testimony she offered as an expert on the Syrian drug business, she never claimed to have heard of Tony Kassis, validating the notion that in any deal involving both him and Ali Shalish, the latter would have been the party in charge.

Further, to the extent this adjustment rests on the notion that Mr. Kassis had "ties" to high-level officials, that is not a basis for applying this upward adjustment. First, as already discussed, the preponderance of the evidence was that Mr. Kassis did not have special access to power, but instead was aware that someone would have to pay the "checkpoint tax" the Assad regime would exact from anyone receiving cocaine at a Syrian port. Second, even the statements of Mr. Kassis and Kherfan did not suggest that Mr. Kassis "led" or "managed" any Syrian official.

Finally, Mr. Kassis was in the process of being evicted during much of the time he was negotiating this deal and owed a lot of people money.[11] This is hardly consistent with his being someone with a staff of 300 who could "lead" or "manage" a high-up member of the Assad regime.

In sum, the Court should find that there is insufficient evidence to apply this guideline.

### 3.  § 2D1.1(b)(16) does not apply for several reasons.

The PSR assigns 2 levels to Mr. Kassis's guideline calculation on the theory that he was "directly involved in the importation of a controlled substance," § 2D1.1(b)(16)(C), and/or that he "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood," pursuant to § 2D1.1(b)(16)(E). Neither applies.

First, a prerequisite for application of an enhancement under any part of § 2D1.1(b)(16) is that the defendant receive an adjustment under U.S.S.G. § 3B1.1.

---

[11] PSR ¶¶ 100, 110.

18

Because the adjustment in § 3B1.1 does not apply, as explained above, neither does any part of this enhancement. Second, the enhancement only applies if either or both of the factors in (b)(16)(C) and (E), applies, and neither does.

The government does not defend Probation's conclusion that § 2D1.1(b)(16)(C) applies to this case, *see* ECF 195 at 6-7. The enhancement does not apply because Mr. Kassis was not convicted of or even accused of "importation." In the context of § 2D1.1, "importation" can only reasonably be interpreted to mean "importation into the United States," the offense set out in 21 U.S.C. § 960, one of the offenses covered by § 2D1.1, and an offense distinct from the charge of conviction, 21 U.S.C. § 960a, which is covered by a separate guideline, § 2D1.14. Further, not only was there no accomplished "importation," but this offense did not involve *any* completed delivery of any drugs to *any* place.

Both Probation and the government conclude that subsection (b)(16)(E) applies here, but that is wrong as well. This enhancement points to definitions in Application Notes 1 and 2 of U.S.S.G. § 4B1.3 for definitions of "pattern of criminal conduct" and "engaged in as a livelihood" *See* U.S.S.G. § 2D1.1, App. Note 20(C). Those definitions are as follows:

> 1.   "Pattern of criminal conduct" means planned criminal acts occurring over a substantial period of time.  Such acts may involve a single course of conduct or independent offenses.
>
> 2.      "Engaged in as a livelihood" means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; *and* (B) the totality of circumstances shows

19

> that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct).

U.S.S.G. § 4B1.3, Appl. Note 2. Even assuming the evidence at trial could support a preponderance finding of a "pattern of criminal conduct," the Court should not apply the enhancement in U.S.S.G. § 2D1.1(b)(16)(E) because there was not evidence sufficient to establish that such was engaged in as a "livelihood" under the above definition. Specifically, there was no evidence that Mr. Kassis did not have other legitimate income (and there is evidence to contradict that), and there was no evidence that he derived any particular level of income from criminal conduct in any 12-month period, let alone enough to satisfy the threshold set out in application note 2(A) of § 4B1.3 ($14,500).

The government claims that Mr. Kassis "admitted" that he did not have legitimate income after closing down his businesses in 2018, and essentially argues that Mr. Kassis *must have* made more than $14,500 in 12 months at some point. ECF 195 at 6. The evidence the government points to for the latter factor is that he told agents that he had expected to earn several hundred thousand dollars if the deal with CS1 and CS5 came to fruition, and the evidence that he had been involved in drug transactions in earlier years, specifically CS6's claims that Mr. Kassis was involved in dealing in the 1990s, his supposed admission that he used his previous businesses "to distribute drugs," and documents related to shipments to Syria in and after the year 2017. ECF 195 at 6 -7.

20

First, Mr. Kassis did not "admit" to using his clubs to further drug distribution, as already discussed.[12] Nor did he "admit" to having no legitimate work after he exited the restaurant business involuntarily around 2018; the government assumed that from that from the absence of more information about his work after 2018 in the PSR.[13] As one of Mr. Kassis's supporters notes in the video presented to the Court, Mr. Kassis used his dual citizenship to ferry across the border goods not available in Syria (such as Scotch).[14] He also borrowed money, leaned on his family, and sold assets to get by in recent years, all the while living in a modest ground floor apartment.[15] Still, by 2024, his financial situation had degenerated to the point that his landlord sued him for unpaid rent and was seeking eviction just as Mr. Kassis was in discussions with CS1 and CS5.[16] Finally, many a smaller time player in the

---

[12] *See* page 5, *supra.*

[13] According to the World Bank, among many factors weighing on the Lebanese economy in 2018 were that "[i]ncreased local discord over governance issues are interacting with heightened geopolitical tensions, re-enforcing internal schisms; the Syrian war and its spillovers into Lebanon, albeit progressively more containable, continue with no end in sight; the persistently sluggish economy is taking a toll on private and public balance sheets, further slowing economic activity; rising risk premia for Lebanon is generated from increased exposure to emerging market volatility that is driven by global monetary conditions." "World Bank. 2018. Lebanon Economic Monitor, Fall 2018: De-Risking Lebanon," at https://bit.ly/3QSvWd0 (last visited 6/26/26). These and other factors contributed to "mass protests," foreign exchange inflows drying up, and banks shuttering because they could not "pay depositors queuing outside," the government defaulting on loans, and a collapse of the country's currency, all in 2019. E. Blair, "Explainer: Lebanon's financial crisis and how it happened," *Reuters* (Jan. 23, 2022), at https://bit.ly/4aWG8Im (last visited 6/26/26).

[14] *See* Exhibit 1 (video). *See also* Exhibit 3 (letter from wife).

[15] *See id.*

[16] PSR ¶ 100; Exhibit 2 (eviction litigation documents).

drug trade desperate for money has met his downfall when becoming involved in something much larger than they ever had before. All of this undermines the government's assumptions about Mr. Kassis.

In short, the government has no actual proof of what, if anything, Mr. Kassis has ever made from drug (or weapons) dealing in the past, and the evidence does not support the conclusion that any previous drug trafficking involvement either sustained him or was of a scale similar to that which Kherfan, CS1 and CS5 brought to him in April of 2024. As such, and for the other reasons discussed above, the Court should find that this guideline cannot apply.

## II.    A sentence of 20 years in prison will be sufficient.

*A.    The guideline recommendation of a life sentence is the product of a guideline that an imperfect proxy for assessing culpability or other relevant factors.*

A life sentence would exceed the national mean or median sentence for federal murder in every fiscal year for the last decade:

| Year | Mean | Median |
|------|------|--------|
| 2025 | 286 | 292 |
| 2024 | 274 | 240 |
| 2023 | 285 | 276 |
| 2022 | 261 | 240 |
| 2021 | 244 | 231 |
| 2020 | 255 | 228 |
| 2019 | 255 | 240 |
| 2018 | 291 | 292[17] |

---

[17] These figures come from data on "Sentence Imposed by Type of Crime" that the U.S. Sentencing Commission publishes every fiscal year in a "Sourcebook of Federal Sentencing Statistics" publication. *See, e.g.* U.S. Sentencing Commission, *Fiscal Year 2024 Sourcebook of Federal Sentencing Statistics*, *Sentence Imposed by Type of Crime* (2025), available at: https://bit.ly/4bgftX3 (last visited 6/27/26) The

Yet the guidelines recommend a life sentence in this case. The reason for that is that U.S.S.G. § 2D1.14 provides for an offense level that is driven largely by the type and quantity of drug at issue (determined under U.S.S.G. § 2D1.1), and enhanced by no fewer than 6 levels chosen for the specific purpose of achieving Congress's arbitrary decision to double the punishment for drug trafficking when the defendant knows that such trafficking could benefits any organization involved in "terrorist activity" or "terrorism."

The drug guidelines, USSG § 2D1.1, are not empirically based; and overemphasize drug type and quantity. *See Kimbrough v. United States*, 552 U.S. 85, 95 (2007). The exact level the Commission chose to assign to particular quantities of particular drugs in § 2D1.1 was not based primarily on empirical information about those drugs or quantities. Instead, it was driven by the Commission's need to effectuate the Congressional mandate in the Anti–Drug Abuse Act of 1986 that 21 U.S.C. § 841(b)(1) offenses involving certain quantities of certain drugs result in graduated mandatory minimum sentences that Congress itself chose without empirical evidence.[18] When Congress created the offense in 21 U.S.C. § 960a, providing for penalties to mandatorily be twice whatever the statutory minimum for the equivalent offense under 21 U.S.C. § 841(b)(1)," the Commission used the "six-

---

specific Sourcebooks used to create this table concern Fiscal Year 2018 through 2025, all available at https://bit.ly/4whcyWk (last visited 6/27/26).

[18] U.S. Sent. Comm'n, *Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, at 24 (2011) [hereinafter "*Mandatory Minimum Penalties*"], available at https://bit.ly/4anexA2 (last visited 6/28/26).

level increase" in § 2D1.14 to "effectuate[] the statute's doubling of the minimum punishment for the underlying drug offense." U.S. Sent. Comm'n, Amend. 700 (Nov. 1, 2017). That is, once again, the driving force for the guideline range in these cases is Congress's mandatory minimums, as opposed to empirical data.

Courts are entitled to reject or vary from the guidelines based on policy disagreements, "even in a mine-run case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case." *See, e.g., Spears v. United States*, 555 U.S. 261, 262 (2009).  This is a case in which the Court should exercise that discretion, and afford the applicable guideline range substantially less weight than usual in the § 3553(a) analysis.

B.     *The guideline range is only one factor for the court to consider.*

In any case, the applicable guideline range is only one of several factors that the Court should consider when imposing a sentence. The others include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the need to avoid unwarranted sentencing disparities, (4) the need for restitution, and (5) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).  The Court must weigh each of the sentencing factors, but the central mandate of § 3553(a) requires district courts to impose a sentence *"sufficient,*

24

*but not greater than necessary*" to comply with the purposes of sentencing set forth in § 3553(a)(2).

    C.    *A 20-year sentence will account for Mr. Kassis's personal history and characteristics.*

As outlined in the PSR, Mr. Kassis grew up in Lebanon, a beautiful country that he deeply loves, notwithstanding the fact that it has been plagued by wars most of his lifetime. His family was in the restaurant business, which he and his siblings carried on. He has been married for twenty years. He and his wife are devoted parents, going so far as to leave their beloved family and country for the sole purpose of obtaining better care for their oldest child, who is autistic, in Canada. In the video submitted with this memorandum, Mr. Kassis's sister states that her brother moved his family back to Lebanon because Mr. Kassis missed his family, particularly his mother, too much. He returned to his restaurants, but these did not survive the various crises Lebanon endured in the years between 2018 and COVID crisis. He needed financial assistance from his sister, who helped him rent the modest basement apartment in her building (pictured in Exhibit 1). Family, neighbors, and friends describe his borrowing from others, and selling possessions, to keep his children in their Catholic school, yet also sharing resources with others and otherwise behaving generously. After his restaurants closed, he tried to make ends meet through ferrying across the border goods that are not otherwise available in Syria, taking advantage of his dual citizenship. But it was not enough: by 2024, he was being sued for unpaid rent, and his landlord was evicting the family.

    *D.*    *A 20-year sentence will reflect the seriousness of the offense, but take into consideration the absence of evidence Mr. Kassis shared in any terrorists' goals, and other circumstances of the offenses of conviction.*

The defense does not dispute that to agree to provide support of any kind to any violent organization is a serious offense, and that to do agree to do so in order to make money through the distribution of drugs that can be addictive and sometimes ruin lives is also very serious offense conduct.

That said, the government's characterization of Mr. Kassis as a longtime kingpin of Syrian cocaine and gun trafficking who managed the likes of Ali Shalish, and "partnered" with the Assad regime and Hezbollah, is unsupported by much beyond boasting, as discussed above.

Further, there was no evidence that Mr. Kassis intended for his actions to promote any particular terrorist act (or any particular act of violence) by ELN (or any other group), or that he knew they would.[19] There was also no evidence that he was motivated by any sympathy to any of the political or other goals the government says ELN promoted through violence (or sympathy to any other regime or organization with which the government claims Mr. Kassis interacted). In particular, there is zero evidence that he held any animus toward the United States or any of its interests at home or abroad.

---

[19] The offenses of conviction, conspiracies to violate 21 U.S.C. § 960a and 21 U.S.C. § 2339B, required proof that Mr. Kassis knew that his actions would provide support to the ELN, but not that he knew or intended for any of his actions to support a particular act of terrorism. *Contra* 21 U.S.C. § 2339A.

To be sure, anyone delivering weapons to a drug-dealing organization understands that those actions may contribute to later violence, and this is very serious conduct. For that reason, anyone agreeing to pay for drugs from a large-scale drug distributor with guns would face significant punishment. But the reason Mr. Kassis is facing the particular sentence he is facing is because Congress has determined that it is *worse* to engage in drug dealing transactions when doing so provides anything of value to *particular* people or organizations: those that engage in or have engaged in terrorist activity or terrorism. 21 U.S.C. § 960a.[20] With that as a given, it remains significant that Mr. Kassis did not share in the goals of the ELN, and that he did not even have specific intent to promote those goals or a specific intent to promote any act of terror.

The government may respond that any indifference to the aims of individuals Mr. Kassis chose to transact as part of any drug deal is no better than active support for those goals. But that is wrong. First, that conclusion rests on the assumption that

---

[20] *See* 8 U.S.C. § 1182(a)(3)(B)(iii) and 22 U.S.C. § 2656f(d)(2). At trial, the parties disagreed on the breadth of the universe of conduct that Congress intended to include within the definition of "terrorist activity" in § 960a (ECFs 144, 148, 157), but there is no doubt that Congress intended through § 960a to magnify punishment for drug trafficking *only* if it could benefit a limited universe of parties. At *most*, Congress sought to magnify punishment for drug trafficking that would benefit individuals or organizations who have: (1) engaged in particularly heinous acts of violence (specified in 8 U.S.C. § 1182(a)(3)(B)(iii) and 22 U.S.C. § 2656f(d)(2)); (2) engaged in precursors to or support of a subset of that universe of particularly heinous acts of violence (8 U.S.C. § 1182(a)(3)(B)(iv)(I-III), (iv)(IV)(aa), (iv)(V)(aa), and (iv)(VI)(aa)); or (3) engaged in solicitation for or material support for "terrorist organizations," a universe which includes organizations so-designated by the Secretary of State (8 U.S.C. § 1182(a)(3)(B)(iv), (IV)(bb-cc), (iv)(V)(bb-cc), and (iv)(VI)(bb-dd)).

such indifference to the potential far-reaching effects of a deal like that alleged here was *knowing* indifference.[21] But it is more likely that any such disregard for potential effects reflected just that – failure to consider how a deal concerning drugs for the Middle East in exchange for money or weapons to be delivered to Colombia could have the types of broader affects the government alleges here, particularly on the interests of the United States.

Second, because there is no evidence that Mr. Kassis was motivated by any "cause," there is no evidence that devotion to any cause will be likely to override his own self-interest in avoiding another prosecution in the future. Because Mr. Kassis has learned that who one deals with *can* have *dramatic* impact on where he may be prosecuted and what kind of sentence he faces, any sentence imposed here is likely

---

[21] For example, the government claims that Mr. Kassis knew that "checkpoint taxes" supported "the Assad war fighting effort." ECF 195 at 8, but the government cuts out some of what Kherfan said in the cited exhibit, GE 3-63A at 28-30. Kherfan actually seemed to be stating that he understood the tax to support the nation "*after the war,*" *id.* (emphasis added") and/or to support "famil[ies]" [such as soldier's families]. GE 3-63A at 28-30. *See also id.* (Mr. Kassis stating that the tax went to the "martyr's fund").

Scholarly articles note that a "martyrs' fund" "established by the Assad regime to support the families of fallen soldiers" was a "mysterious" institution," and may have actually supported both "some economic activities" as well as war efforts. *See* "Explained: The Martyrs' Fund, a Main Financier of the Mariota and Basilia City Projects," *The Syria Report* (Sept. 23, 2025), at https://bit.ly/4aZjsap (last visited 6/26/26); A. Aldassouky, "The Economic Networks of the Fourth Division During the Syrian Conflict," *Wartime and Post-Conflict in Syria* (European Univ. Inst., ed) ("Jan. 24, 2020), *available at* https://bit.ly/4gcEGVL (last visited 6/6/26).

But whether funds the regime collected through such "taxes" supported fighting or not, the government's description of this discussion is an example of the government mischaracterizing or reading far more into evidence than is justified in order to support its assumptions about Mr. Kassis's level of knowledge and role.

28

to deter him from ever again dealing with any organization that the United States government deems to be involved in terrorism, or from being indifferent to any counterparty's other doings. Indeed, after spending the mandatory minimum sentence required here, there is no reason to think that Mr. Kassis will not be deterred from engaging in *any* illegality after he serves a 20-year sentence, if he even outlives such a sentence.

Another mitigating factor in this case is that it was the DEA who determined how significant the deal under discussion would be: Mr. Kassis did not insist on 500 kilos, he just agreed to accept that amount. Further, the deal under discussion never went through. To be sure, the DEA put an end to any efforts. But there were also signs in the evidence that Mr. Kassis was never the major dealer he allowed his counterparties to think he was, and that he might have struggled to deliver what he claimed he could. For example, though in early December Mr. Kassis began to send the Colombians images of weapons that he said he had stored in warehouses in Syria, they eventually pointed out that many of these photos had been taken from the internet.[22] He resisted their demands for a second set of photos with "proof of life" markers, finally managing to send only one such image (of two firearms and a dated post-it note, on a couch). He insisted that he needed $10,000 to pay people in connection with holding the weapons for sale to the Colombians, and then sought an

---

[22] As already noted in note 6, *supra*, the timing of his sending photos belies the claim that he was an Assad-regime sponsored weapons trafficker; the fact that he obtained many of the photos he sent from the internet belies the claim that he was an accomplished weapons trafficker at all.

additional $25,000 before the second meeting, requests the counterparties found suspicious, as reflected texts captured from CS1's phone. And although recordings captured Mr. Kassis discussing other drug deals with CS6, they were for amounts significantly smaller than 500 kilos, and it appears from lapses in the history of communication between Mr. Kassis and CS6 provided in discovery that discussions about that went nowhere either.

Along the same lines, whatever Mr. Kassis may have been trying to accomplish with the deal underlying his case, or with CS6 on those recorded calls, the fact that he was fighting eviction from a single-family ground-floor apartment due to unpaid rent in the same period is all the evidence needed to see that Mr. Kassis was no kingpin, but rather, at most, a facilitator or *wannabe* facilitator of the scale of transaction Kherfan and the CSs dropped in his lap in April of 2024.[23]

The government suggests that Mr. Kassis is "unrepentant."[24] But Mr. Kassis's defense at trial was narrow, as are the factual disputes in focus here. By and large, defense positions in this case have reflected a disagreement about the breadth of Mr. Kassis's understanding of CS1 and CS5's backers, and about his supposed closeness with the Assad regime and Hezbollah. Nothing about the positions he has taken

---

[23] PSR ¶ 110.

[24] ECF 195 at 1.

suggest that he is unrepentant, or that he would not be deterred by a sentence to serve twenty years in prison.[25]

### E.   A 20-year sentence will not produce unwarranted disparity.

Monzer al Kassar was a Syrian sentenced to serve 30 years in prison after trial for conspiring to sell 12,000 weapons, including surface to air missiles, to confidential DEA sources posing as representatives of the FARC. *See* ECF 195 at 14 (discussing case).

By the time Mr. Kassar was arrested for the offenses that brought him before the Southern District of New York jury, he had already been incarcerated more than once, and had been wanted for arms trafficking and involvement with various other offenses, including a narcotics trafficking and a terrorist attack, "for thirty years."[26]

> [H]e had developed a reputation as a trafficker willing to
> funnel munitions to rogue states and armed groups in

---

[25] The Court should ignore entirely the claims of a jailhouse informant that Mr. Kassis has suggested that he will continue to be involved in trafficking when released from prison . *See* ECF 195 at 12; Att. 3. The government did not call this person as a witness to be cross-examined at trial, and this is no surprise. Among other reasons to doubt his claims were that he was convicted in one district for distributing enormous quantities of controlled substances and sentenced to serve 188 months in prison; there was evidence that he had lied to his customers by knowingly sending them fentanyl and methamphetamine pills he marketed as less harmful off-market prescription drugs; he was under investigation in at least one other district for a distribution resulting in death, which would have exposed him to a 20-year mandatory sentence, and likely exposed to such charges all over the country; he immediately sought to cooperate in several districts, obviously attempting to reduce his sentence and avoid other charges; and he lied to a Probation Officer in an effort to reduce his initial sentence.

[26] Patrick Raden Keefe, "The Trafficker," *The New Yorker* (Jan. 31, 2010), available at https://bit.ly/4vBOFsr (last visited 6/26/26). In particular, Kassar was said to have "long-standing ties with several Palestinian terror groups; a U.S. congressional report once referred to him as 'the Banker of the PLO.'" *Id.*

defiance of international sanctions and embargoes. He has been accused of many transgressions: fuelling conflicts in the Balkans and Somalia, procuring components of Chinese anti-ship cruise missiles for Iran, supplying the Iraqi Army on the eve of the U.S. invasion in 2003, and using a private jet to spirit a billion dollars out of Iraq and into Lebanon for Saddam Hussein. A 2003 United Nations report branded him an "international embargo buster." In 2006, when Iraq's new government released its list of most-wanted criminals, Kassar was No. 26. (He was "one of the main sources of financial and logistics support" for the insurgency, an Iraqi official said.) Authorities claimed that Kassar had been involved in smuggling drugs, financing terrorist groups, and ordering the assassination of various rivals and witnesses against him. Expelled from England, and convicted in absentia on terrorism charges in France, for supplying explosives that were used in a 1982 attack on a restaurant in the Jewish Quarter in Paris, he had been a wanted man for thirty years.[27]

One incident for which several countries' law enforcement officers believed he had supplied weapons was the "hijacking the Italian cruise ship the Achille Lauro, in 1985," which resulted in the murder of an American citizen, and which was attributed to "Abu Abbas, the former head of the Palestine Liberation Front."[28] He was acquitted of charges stemming from the incident in Spain, but American interest in the case persisted, and led to the sting that brought him before the New York court.[29]

---

[27] *See id.*

[28] *See id.*

[29] *See id.* ("The trial, which began in December, 1994, in Madrid, was a debacle for law enforcement. . . . But the most remarkable feature of the proceedings was the string of misfortunes that began to strike the witnesses for the prosecution.").

32

In contrast, though Mr. Kassis's name had come up in other debrief reports, no one had described Mr. Kassis as being remotely comparable to al Kassar, and Mr. Kassis became a target in this case only because another target raised his name.

Further, al Kassar lived in a palatial villa in Marbella, Spain, kept by an enormous staff, and traveled in private planes, etc.; confidential sources were met by layers of bodyguards when they met with him.[30]  Mr. Kassis apparently wished to burnish his credentials by claiming to CS6 that he had replaced al Kassar. But CS6's reaction to hearing this in 2024 ("Alright, my brother, that's good news"), and the Kassis family home and eviction papers show the truth: Mr. Kassis had neither the reputation nor the experience that al Kassar had when he was arrested.

Evidence at the al Kassar trial included recordings of him saying that he liked the FARC's "cause against the United States" and saying that he could "provide a thousand men to help fight against the United States."[31] He knew that the purported FARC agents planned to use surface to air missiles to attack American helicopters, and specifically to "kill all of those Americans."[32] It was on the basis of comments like these that al Kassar was also convicted of conspiracy to murder Americans and American officials, and to traffic in surface to air missiles, the latter of which is why the mandatory minimum in his case was 25 years.[33]

---

[30] *See id.*

[31] Gov't Sent. Mem., *U.S. v. al Kassar*, 1:07-cr-354-JSR, ECF 108 (filed 2/23/09) at 6.

[32] *Id.* at 7. 8

[33] *See id.*

Al Kassar had been undeterred by previous incarcerations. He was targeted because he was notorious for involvement with narcotics trafficking, weapons trafficking, and specific instances of terrorism. His lifestyle both corroborated what had been said about him for years, and made clear that more than money drove him to join the particular plot the agents in that case concocted. Given these contrasts to Mr. Kassis's case, the government's suggestion that Mr. Kassis's sentence should be longer than al Kassar's makes no sense.

Victor Bout, whose sentence the government also points to, also was not like Mr. Kassis. According to the DOJ press release about his 25-year sentence for agreeing to sell "800 surface-to-air missiles (SAMs), 30,000 AK-47 firearms, 10 million rounds of ammunition, five tons of C-4 plastic explosives, 'ultralight' airplanes outfitted with grenade launchers and unmanned aerial vehicles" to FARC representatives, he too had been a notorious weapons trafficker and U.S. law enforcement target for years when DEA agents ensnared him.[34] And like al Kassar, he was convicted of conspiracy to murder Americans, whom he specifically called his enemy.

Mr. Kassis's conduct is also less aggravated than that of the other weapons trafficking defendants the government points to, all of whom were convicted of

---

[34] U.S. Att. Office, S.D.N.Y., Press Release, "International Arms Dealer Victor Bout Sentenced in Manhattan Federal Court to 25 Years in Prison for Terrorism Crimes" (Apr. 5, 2012), at https://bit.ly/4eyDkUa (last visited 6/28/26).

conspiring to support particular terrorist acts and/or to kill Americans, and all of whom had actually completed weapons deliveries and more:

- Pahlawan, whose ship's interdiction led to the death of two Navy SEALs, was convicted of supporting specific terrorist acts by Houthi rebels by delivering missiles to them on behalf of Iran, and the government offered evidence that he had completed multiple such voyages, and threatened witnesses);[35]

- Alahmedalabdaloklah developed and supplied IED components to be used against Americans, for over 5 years.[36]

- Al Farekh, an American citizen – traveled overseas, joined al Qaeda, and conspired to kill Americans, including through a completed attack using explosive devices on a U.S. military installation in Afghanistan in 2009 that resulted in injuries to an American and several Afghanis.[37]

- Hammadi and his codefendant were two former Iraqi insurgents who "participated in terrorist activities overseas and attempted to continue

---

[35] U.S. Dep't Justice, Press Release, "Pakistani National Sentenced to 40 Years for Transporting Iranian-Made Advanced Conventional Weapons" (Oct. 23, 2025), at http://bit.ly/4asNuDh (last visited 6/28/26).

[36] U.S. Dep't Justice, Press Release, "Syrian Man Sentenced For Terrorism-Related Crimes" (Nov. 7, 2018), at https://bit.ly/3Syiv2I (last visited 6/28/26).

[37] U.S. Dep't Justice, Press Release, "American Citizen Sentenced to 45 Years' Imprisonment for Conspiring to Murder U.S. Nationals and Providing Material Support to Al-Qaeda" (Mar. 13, 2018), at https://bit.ly/4eMXaKh (last visited 6/28/26).

providing material support to terrorists while they lived here in the United States."[38]

Mr. Kassis is also not like the drug traffickers to whom the government points. ECF 195 at 15. First, all of them conspired to import drugs *into the United States*, unlike Mr. Kassis. Several of them, including Lorenzana-Cordon and Hernandez Alvarado, were, like al Kassar and Bout, longtime targets, notorious for what they were ultimately convicted, unlike Mr. Kassis.[39] At least some were shown to live lavish lifestyles, such as Montes Bobadilla, and to traffic in significantly larger quantities than Mr. Kassis was attempting here, such as Montes Bobadilla, who was described as having trafficked in the tens of thousands of kilos by multiple witnesses, and Gravito-Garcia, who conspired to receive 4000 kilos (and also to sell weapons, including surface to air missiles), in exchange.[40] And Mr. Kassis does not begin to compare to Juan Anontio Hernandez Alvarado, a Honduran congressman and brother of the Honduran president, who the government described as having played a

---

[38] U.S. Dep't Justice, Press Release, "Former Iraqi Terrorists Living in Kentucky Sentenced for Terrorist Activities" (Jan. 13, 2013), at https://bit.ly/4oXKC7t (last visited 6/28/26).

[39] *See, e.g.,* U.S. Dep't Justice, Press Release, "Leader of Guatemalan Drug Trafficking Organization Sentenced to Life in Prison" (Feb. 22, 2018), at https://bit.ly/4eNIeLT (last visited 6/28/26).

[40] Gov't Sent. Memo, *U.S. v. Montes Bobadilla*, 1:15-cr-290, ECF 265 (filed 4/29/19) at 5 (requesting a sentence of 30 years though the guidelines were life, given that this would "effectively" amount to a life sentence given that defendant's age); U.S. Dep't Justice, Press Release, "Colombian Narcotics Trafficker Sentenced In Manhattan Federal Court To 25 Years In Prison For Conspiring With West African Military Officials To Engage In Narco-Terrorism" (July 20, 2015), at https://bit.ly/4vUFNi5 (last visited 6/28/26).

leadership role in Honduras's "violent, state sponsored drug trafficking conspiracy" for fifteen years, enriching himself to the tune of "at least $138.5 million" through exporting at least 185,000 kilos of cocaine to the United States, with the help of the Honduran military, bribes, selling weapons to other traffickers, controlling his own laboratories, and helping to "cause at least two murders."[41] He also was accused of witness tampering and obstruction during his prosecution.[42]

In short, sentences of the type the government seeks here have been imposed in cases in which there were significant aggravating factors not present here. Accordingly, the government has not established that a twenty-year sentence would produce unwarranted disparity.

F.    *A 20-year sentence will be sufficient to accomplish the goals of sentencing.*

According to current data, the average 60-year-old Lebanese man can expect to live to about 80.[43] Mr. Kassis's expectations should likely be lower, given his diabetes diagnosis.[44] And research has shown that incarceration tends to shorten life

---

[41] Gov't Sent. Memo*, U.S. v. Hernandez Alvarado*, 1:15-cr-379-PKC, ECF 269 (filed 3/16/21), at 1-3. *See also* U.S. Dep't Justice, Press Release, "Former Honduran Congressman Tony Hernández Sentenced To Life In Prison And Ordered To Forfeit $138.5 Million For Distributing 185 Tons Of Cocaine And Related Firearms And False Statements Offenses" (Mar. 30, 2021), at https://bit.ly/4wjSUJp (last visited 6/28/26).

[42] *Id.*

[43] *See* "Life expectancy by current age*," Georank.org* , at https://bit.ly/3QSvj38 (last visited 6/25/26) (showing data from United Nations | World Population Prospects (2026, retrieved 2026-03-10).

[44] U.S. Centers for Disease Control, "How People With Type 2 Diabetes Can Live Longer (May 15, 2024) at https://bit.ly/4v0LdGU (last visited 6/24/26) (At age 50, life expectancy is 6 years shorter for people with type 2 diabetes than for people

expectancy.[45] All of this is to say that if Mr. Kassis is sentenced to even the mandatory minimum term of 20 years in this case, the rest of his life may be spent in a United States prison, and it is even more likely that the rest of his life at full health will expire while in prison.[46]

Meanwhile, he will have to live in an undoubtedly higher-security prison in a foreign land, and with the painful knowledge that his wife must care for their special-needs son without his assistance. He will miss out on his sons becoming full adults, perhaps marrying, and perhaps having children of their own.

If Mr. Kassis is so fortunate so as to walk out of a U.S. prison alive when he is 77 years old, he can still expect for his life to have been shortened.[47] He will undoubtedly spend additional time incarcerated in the custody of immigration

---

without diabetes. By meeting type 2 diabetes treatment goals, life expectancy can increase by 3 years, or for some, as much as 10 years.").

[45] E. Widra, "Incarceration shortens life expectancy," *Prison Policy Initiative* (June 26, 2017, updated March 2021), at https://bit.ly/44FvrWY (last visited 6/24/26) (summarizing this research as supporting the conclusion that "[e]ach year in prison takes 2 years off an individual's life expectancy").; E. Widra, "New research: How past incarceration affects people later in life," *Prison Policy Initiative* (June 9, 2026), at https://bit.ly/4uVXM69 (last visited 6/24/26) (noting that prior research showed that "incarceration accelerates physiological aging and shortens life expectancy overall [and newer research reveals] that older adults who have experienced any amount or form of incarceration in their lives have shorter life expectancies than their peers who have never been incarcerated").

[46] "Healthy life expectancy at birth, defined by the World Health Organization as the average number of years a person can expect to live in full health, is 63.2 years in Lebanon and 63.9 in the United States. People who reach age 60 can expect an additional 14.2 healthy years in Lebanon and 15.7 in the United States." *See* "Life expectancy by current age*," Georank.org, supra* note 43.

[47] *See* note 45, *supra.*

authorities awaiting deportation. If he is deported back to Lebanon, he can perhaps look forward to a second prosecution there, and being otherwise at risk due to accusations that he supported the Assad regime or Hezbollah.

In short, the proposed sentence will provide ample punishment. It will also be sufficient to deter Mr. Kassis and protect the public from any further offenses by him, as already discussed. Finally, the fact that a 20-year United States prison term and prosecution have resulted in this case – in which nothing was to be done in the United States, no drugs were to be imported into the United States, the defendant did not step foot in the United State, was not involved in a plot to commit an act of terror, and never described the United States as an enemy – should deter anyone abroad who may be paying attention to potential punishments.

For these reasons, and such others as may be offered at the upcoming sentencing hearing, the defense respectfully requests that the Court sentence Mr. Kassis to 20 years on Count 1, and 10 years on Count 2, followed by the required terms of supervision. Finally, as Mr. Kassis does not have the ability to pay a fine, the defense asks that the Court not impose one.

Respectfully submitted,

**ANTOINE KASSIS**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by: */s/*

39

Ann Mason Rigby
Virginia Bar No. 92996
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Phone: (703) 600-0800
ann_rigby@fd.org

Nathaniel Wenstrup,
Virginia Bar No. 96324
Assistant Federal Public Defender
Eastern District of Virginia
1650 King Street, Ste. 500
Alexandria, Virginia, 22314
Phone: (703) 600-0825
Email: nate_wenstrup@fd.org

40